UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID GILLUM,

    *Plaintiff*

    **v.**

SAFEWAY, INC.,

    *Defendant*.

Civil Action No. 2:13-cv-02047

MEMORANDUM ORDER AND OPINION

Defendant Safeway Inc. ("Safeway") brings this motion for summary judgment, seeking dismissal of the hostile work environment, racial discrimination, and retaliation claims raised by Plaintiff David Gillum under Title VII, 42 U.S.C. § 1981 and the Washington Law Against Discrimination ("WLAD"). After reviewing the briefs and all other relevant material properly before the Court, the Court grants Safeway's motion for summary judgment, with respect to the Gillum's racial discrimination claim, and denies Safeway's motion for summary judgment, with respect to the hostile work environment and retaliation claims.

## I.      LEGAL STANDARD

### A.  Summary Judgment Generally

Summary judgment is appropriate where "there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that may affect the case's outcome." *Colorado Cas. Ins. Co. v. Starline Windows, Inc.*, No. C12–2218–JCC, 2014 WL 1328491, at *1 (W.D. Wash. Apr. 1, 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute about a material fact is genuine if there is enough evidence for a reasonable jury to return a verdict for the nonmoving party." *Id.* "[E]vidence must be viewed in the light most favorable to the nonmoving party, and

all justifiable inferences must be drawn in the nonmovant's favor." *Id.* (citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011)).

### B. Legal Standard for Summary Judgment for Racial Discrimination and Retaliation Claims Under Title VII and 42 U.S.C. § 1981

Claims of employment discrimination are examined under the framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). Initially, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of a specific employment discrimination claim. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted). If the plaintiff meets that burden, the burden shifts to the defendant "to articulate some legitimate, [non-discriminatory] reason for" its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802, 804). If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the presumption raised by the prima facie case is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted). At this point, the employee has an opportunity to introduce evidence that "the proffered reason was not the true reason for the employment decision, and that race was." *St. Mary's Honor Ctr.*, 509 U.S. at 508 (citing *Burdine*, 450 U.S. at 256). The court must consider whether the jury could infer discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-discriminatory justification was pretextual. *See id.*

## II.     BACKGROUND

Plaintiff David Gillum is a 52-year-old African American who has worked for Defendant Safeway since 1996. (Doc. No. 33, Ex. C at 4). For most of his employment with Safeway, Gillum worked as a "floating meat cutter"—he cut and packaged meat at various area stores for

short periods of time. (*Id.*). From July 2001 through July 2013, he received "good" and "exceptional" performance reviews. (Doc. No. 33, Ex. A).

In 2010, District Manager Bret Podnar and Meat Merchandiser Shawn Kaiser decided to assign Gillum to a permanent position in Safeway's Renton Highlands store under the supervision of meat market manager Gary Brown. (Hunter Decl., Ex. A at SW000082). Safeway proffers that it transferred Gillum to work under Brown's supervision due to Gillum's "performance issues." (Gillum Decl. ¶4). However, Gillum alleges that Safeway managers transferred him to work under Brown in the hopes that Brown would cause him to be fired. In making this argument, Gillum relies on the deposition of Collette Thomas, a Safeway meat market manager. According to Thomas, Shawn Kaiser initially asked Thomas if he could place Gillum under her supervision so she could fire Gillum. (Thomas Decl. ¶15).  Kaiser told Thomas that "[he] just want[s] that black piece of shit gone" and that Safeway's Operation manager Jon Blank wanted Kaiser to "get [Gillum] good or get [him] gone." (Thomas Decl. ¶15). According to Gillum, shortly after this conversation, Safeway placed Gillum under the supervision of Gary Brown. (*Id.* at ¶16). According to Thomas, Brown  often expressed racist views, especially toward African Americans. In fact, Thomas asserted that Brown used racial slurs such as "nigger" routinely, "if not every day," around employees and "any time occasion arose." (*Id.* at ¶¶4-13).

Thomas asserts that, while only store managers have the ultimate authority to fire employees, meat market managers, such as Brown, have substantial input into promotion and firing decisions. (Hudson Decl. ¶8 at 86:6-19).  According to Thomas, meat market managers may provide written discipline to employees working in the meat section and these "write ups" can result in either suspension and/or termination. (Thomas Dep., Ex. J at 86:5-87:5). Meat market managers can also influence compensation. (*Id.* at 89:11-90:11). For example, Gary Brown controlled the number of shifts employees in his department worked. (*Id.*).

3

Safeway's written policies encouraged its employees to report discrimination issues at work to any manager; the manager was then supposed to report the issue to Human Resources. (Doc. No. 33, Ex. D, Hunter Dep. 39:24-40:15). Around April or May of 2010, some time after his first day under Gary Brown's supervision, Gillum reported to Anita Keahey, a scheduling coordinator, that he had problems with Brown and did not want to work with him. (Gillum Decl. ¶7). However, Gillum does not state which specific problems he reported to Keahey.  That same day, Gillum received a call from Signe Hunter, the Human Resources manager. (Doc. No. 33, Ex. B, Gillum Dep.101:23-104:11). During that phone call, Gillum reported to Hunter that Brown made several racist comments at the workplace.  Gillum also asserted that Brown discouraged Gillum from complaining about Brown's actions, telling Gillum "what happened at the store stayed at the store" and that he would "hunt" Gillum down if he complained. (*Id.* at 113:22-114:11). Hunter did not follow up on Gillum's report. Instead, according to Gillum she said: "David, David, David, you are going to be fine." (Gillum Decl. ¶7).

Gillum asserts that after his first report to Hunter, according to Gillum, Brown continued to make racist comments in Gillum's presence. For instance, Brown remarked that African Americans liked certain kinds of meat and that he does not order "that kind of meat" for "those kinds of people." (*Id.* at ¶9).  Brown also referred to downtown Renton as "niggerville." (*Id.*). According to Gillum, Brown made comments like "Blacks are lazy" and "always on welfare" and that Brown did not want "them" shopping at his store. (*Id.* at ¶10)  On one occasion, Brown even remarked that "[w]hen Black people's hands touch the meat, the meat turns purple." (*Id.*). On another occasion, Gillum overheard Brown say "we are going to work that nigger into the ground." (*Id.* at ¶8). Gillum asserts that Brown made these and similar comments routinely, sometimes many times per day. (*Id.*).

Around mid-June 2010, Gillum complained to Lee Trutmann, a store manager, about Brown's behavior and his use of racially derogatory words. Trutmann defended Brown, telling

4

Gillum that Brown was a "good guy." (*Id.* at ¶¶13-14). After this conversation, Brown told Gillum that Trutmann lets Brown do what he wanted and that Gillum better not be "snitching." (*Id.* at ¶6).

Around June 29, 2010, Gillum complained to Anita Keahey again, telling her that he was not getting adequate help wrapping the meat, that Brown discriminated against him, and that there was a concerted effort by the managers to terminate Gillum because he was black. (*Id.* at ¶15). Shortly after this report, Brown, Kaiser, and Trutmann called Gillum to the manager's office. (*Id.* at ¶16). They told Gillum that his job performance was unsatisfactory, that he soon would be let go, and that he better cut enough meat for "today and tomorrow." (*Id.*). After Gillum asserted that he would not be able to complete the meat cutting task without more help, Brown responded "[b]oy, are you being insubordinate?"( *Id.*).  Gillum immediately telephoned Hunter and reported this incident to her and expressed his fear that Hunter could not protect him from Brown. (*Id.* at ¶17). Hunter told Gillum that she did not have time to speak to him because she had a pedicure appointment and that Brown and Trutmann were "good guys." She also claimed that Gillum was just "telling stories." (*Id.* at ¶23). Gillum reported the meeting to the Renton Police Department as well because, Gillum asserts, he felt threatened and unprotected. (*Id.* at ¶¶18-19).

On July 6, 2010, Gillum contacted Anita Keahy again, telling her about Brown's and other managers' racial hostility. (*Id.* at ¶18). He also complained about Brown calling Gillum a "nigger." (*Id.*). On July 9, 2010, Gillum met with Hunter and told her about the police report he filed. Hunter responded by telling Gillum that he should not do anything to hurt the company. (*Id.* at ¶21). Gillum asserts that he continued to complain to Hunter about Brown's racist behavior, but Hunter told Gillum that he would have to go back to Brown's store. (*Id.* at ¶23). Hunter did not investigate Brown's behavior; however, she did investigate Gillum's job

performance. (Doc. No. 33, Ex. D 142:22-143:1, 162:1-23, 166:13-167:25; 169:6-18).[1] On November 17, 2010, Hunter officially "closed" her investigation regarding the harassment because she found Gillum's complaints unsubstantiated. (Doc. No. 33, Ex. D at 11).

At some point prior to January 1, 2011, Gillum went back to being a "floating meat cutter."  Around January 1, 2011, Gillum received a call on a store telephone, in which the caller called Gillum "a snitching nigger" and "a dead nigger." (Gillum Decl. ¶27). Gillum asserts that Brown made this threatening phone call. (*Id.*). On April 23, 2012, Clint Miller, a meat market manager at a different store location, called Gillum's cell phone to call him a "snitching nigger" and inform him that "we are going to get you" and "fuck you up." (*Id.* at ¶29). On another occasion, Clint Miller pulled out a pocket knife, opened it, and held it in front of Gillum while giving him a "menacing stare." (*Id.* at ¶31). On yet another occasion, Clint Miller showed up to work drunk and called Gillum "black piece of shit" when Gillum refused to go to the liquor store to buy alcohol for Miller. (Doc. No. 33, Ex. B, Gillum Dep. 156:20-158:5). Gillum also asserts that in February 2012 a different meat market manager scolded him and another African American by calling each of them "boy." (Doc. No. 29, Ex. B).

In October 2012, Gillum submitted a discrimination charge to the EEOC. (Down Decl., Ex. A). Hunter contacted Gillum about the complaints in the charge; Gillum refused to talk to her. The EEOC issued a "No Cause" finding and "Right to Sue" letter in August 2013. (Down Decl., Ex.D). On November 13, 2013, Gillum filed the present action in this court. Safeway now moves for summary judgment.

---

[1] In her deposition, Hunter stated that she normally investigated the statements of the complainant to determine if they were corroborated by other witnesses. If so, she would look at the alleged violator's prior history to see if similar complaints were made about him in the past. (Doc. No. 33, Ex. D at 60:2-8, 24-25; 61:1-7, 24-25; 62:1-23). However, Hunter did not follow this practice when investigating Gillum's complaints about manager Brown. ( *Id.* at 105:11-25; 106:13-107:23).

### III.     GILLUM'S HOSTILE WORK ENVIRONMENT CLAIM

In order to establish a hostile workplace claim under Washington Law Against Discrimination (WLAD), a plaintiff must show: (1) unwelcome harassment; (2) that is attributable to plaintiff's membership in a protected class; (3) that affected the terms and conditions of plaintiff's employment; (4) that is imputable to his employer. *Davis v. State, Washington State Patrol*, 2014 WL 5144762, at *9 (Wash. Ct. App. Oct. 13, 2014) (citing *Loeffelholz v. Univ. of Wash.*, 285 P.3d 854, 859 (Wash. 2012)). Similarly, under Title VII, a plaintiff is required to establish that: "(1) [he] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008) (citing *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003)). In addition, under Title VII, the employer's liability for the employee's harassment can attach based on negligence[2] or vicarious liability. The employer is vicariously liable for the employee's harassment if the harassing employee is a supervisor "with immediate (or successively higher) authority over the employee." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

Both Title VII and WLAD require that the conduct of unwelcome harassment be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow v. Georgia-Pacific, Corp.*, 693 P.2d 708, 712 (Wash. 1985). Courts determine whether "an environment is sufficiently hostile or abusive by looking at all the circumstance, including frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S.

---

[2] "An employer is negligent with respect to . . . harassment if it knew or should have known about the conduct and failed to stop it." *Ellerth*, 524 U.S. at 759.

775, 787-88 (1998); *Glasgow v. Georgia-Pacific, Corp.*, 693 P.2d 708, 712 (Wash. 1985).

"'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the 'terms and conditions of employment.'" *Dominguez-*

*Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005).

**A.   Is the Alleged Conduct Sufficient to Find A Hostile or Abusive Work Environment?**

Safeway asserts the alleged conduct was not sufficiently severe or pervasive because the

alleged statements were isolated and "one-off."  (Doc. No. 26 at 14).  According to Safeway,

Gillum does not have a hostile workplace claim because he alleges only that he was called a

"nigger" or "boy" on one or two occasions. (*Id.*). Gillum counters that the comments were

frequent, not isolated. Gillum cites to evidence in the record demonstrating that his managers

used words such as "nigger," "niggerville," and "boy" on several occasions at the workplace.

(Gillum Decl. ¶¶9-10). Gillum further contends that Brown told him that "all Blacks are lazy,"

bad customers, and "always on welfare." (*Id.* at ¶10). According to Gillum, Brown said that an

African American person's hands turn meat purple. (*Id.*). Gillum also asserts that Clint Miller, a

meat market manager, called him a "black piece of shit" and threatened him with a knife. (Doc.

No. 33, Ex. B, Gillum Dep. 156:20-158:5). Gillum also alleges that he received phone calls from

Brown and Miller calling him "snitching nigger," and "dead nigger, we are going to get you . . . I

am going to fuck you up." (Gillum Decl. ¶¶27, 29).[3]

Assuming the facts to be as Gillum states them, Gillum has demonstrated that the

alleged conduct was sufficiently severe or pervasive to alter the conditions of the Gillum's

---

[3] Gillum further asserts that even the infrequent use of the term "nigger" is sufficient to support a hostile work
environment claim.  Safeway counters that these statements are insufficient because they are merely "stray"
remarks.  (Doc. No. 39 at 4-5).  The Court strongly disagrees with Safeway. A comment may be a stray remark if it
is ambiguous or does not clearly relate to an employee's race. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,
1116 (9th Cir. 2004); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (calling other employee
"a bright, intelligent, knowledgeable young man" is a stray remark in age discrimination case).  However, as the
Ninth Circuit has recognized, "nigger" is "perhaps the most offensive and inflammatory racial slur in English, . . . a
word expressive of racial hatred and bigotry." *McGinest*, 360 F.3d at 1116 (citations omitted). "Perhaps no single act
can more quickly alter the conditions of employment and create an abusive working environment than the use of an
unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* (citations
omitted).

employment and create an abusive work environment. Thus, the summary judgment as to this element of the hostile work environment place is improper at this time

**B.  Could Brown's Conduct Be Attributable to Safeway?**

Both WLAD and Title VII require that the employee's conduct of harassment be imputed to the employer in order to make employer liable for its employee's conduct.

Safeway asserts that the alleged conduct cannot be imputed to Safeway because the employees at issue did not have the authority to reassign, "write up, hire, fire, or demote anyone."  (Kelley Dep. at 51:19-52:2).

Under WLAD, liability for harassment may be imputed directly to the employer only where an "owner, manager, partner or corporate officer personally participates in the harassment."  *Glasgow v. Georgia-Pacific, Corp*, 103 Wn.2d 401 (1985).  The offending manager must hold a sufficiently high level position to be considered its alter ego. *Davis*, 2014 WL 5144762, at *9. A manager is considered the employer's alter ego if he can influence terms and conditions of the plaintiff's employment. *See Davis v. Fred's Appliance, Inc.*, 287 P.3d 51, 59 (Wash. Ct. App. 2012).[4] For example, a manager is the employer's alter ego when he has an authority to hire, fire, or punish employees, helps to create company's policies, business or marketing strategies, or to execute company's contracts. *See id*. However, the employer's assertions that a given employee does not have an authority to hire or fire employees is not dispositive on the issue of whether such employee still could be considered the employer's alter ego. *Delahunty v. Cahoon*, 832 P.2d 1378, 1382-83 (Wash. Ct. App. 1992). This is a factual inquiry. *See id.* (holding that the issue of whether the supervisors responsible for harassment

---

[4] Because under Title VII the employee responsible for harassment need only hold immediate or successively higher position over plaintiff in order to impute liability for his conduct directly to employer, *see Ellerth*, 524 U.S. at 764-65,  Safeway will be directly liable for the managers harassment under Title VII if the jury finds that the harassing managers were Safeway's alter ego under WLAD. *See also Faragher*, 524 U.S. at 808 (finding vicarious liability based on the manager's sexual harassment where the manager was responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training).

were managers for the purposes of the employer's direct liability for the supervisors' conduct, was properly submitted to the jury).

Gillum offers evidence that meat market managers possessed and exercised significant authority over some aspects of the terms and conditions of employment. According to Gillum, meat market managers can provide written discipline to employees and these "write ups" can result in either suspension and/or termination. (Doc. No. 33, Ex. J at 86:5-87:5). According to the deposition of Collette Thomas (a meat market manager at one of the Safeway stores) and Gillum's own allegations, meat market managers have substantial input into promotion and firing decisions: for example, if, as Gillum claims, Safeway employees attempted to effectuate Gillum's firing by assigning him to certain meat market managers, it would suggest that meat market managers can punish employees. Furthermore, Brown could and did change the shifts of the employees, which affected compensation and working conditions. (Thomas Dep., Ex. J at 89:11-90:11, Oct. 14, 2014). In addition, Gillum testified in his deposition that Trutmann, a store manager with the clear authority to fire employees, participated in the meeting with Kaiser and Brown during which they threatened to fire Gillum, and, during which, Brown called Gillum "boy." (Gillum Decl. ¶16).  Accordingly, viewing the facts in the light most favorable to Gillum, Gillum has created a dispute of fact as to whether the managers allegedly responsible for the hostile work environment actually possessed the authority to discipline and otherwise affect Gillum's employment.

Under WLAD, the conduct of an employee can be indirectly imputed to the employer even if the employee is not the company's alter ego, if the employer knew or should have known of the hostile behavior and failed to take reasonable corrective actions to end the harassment. *Davis*, 2014 WL 5144762, at *9. Similarly, under Title VII, if plaintiff's co-workers rather than supervisors are the source of harassment, the employer is liable for the co-worker's behavior if the employer was negligent in addressing and correcting such behavior. *See Vance v. Ball State*,

133 S.Ct. 2434, 2439 (2013). Here, Gillum provided evidence that he complained about the harassment, but Safeway failed to take reasonable corrective actions.[5] For example, Gillum alleges that he complained to Anita Keahey several times about Brown's racist comments. (Gillum Decl. at ¶¶7, 15, 18). He further alleges that when he complained to Hunter about Brown using "racist slurs," she interrupted his complaints saying "David, David, David, you are going to be fine." (Doc. No. 33, Ex. C at 6). Gillum testified at deposition that he continued to complain to Hunter about Brown and other managers' behavior. Gillum also testified that he did not receive any "feedback from [his] reports to [Hunter], and was fearful." (Gillum Decl. ¶23). Gillum further testified that "[he] complained that Hunter could not protect [him]." (*Id.*) In response to his reports, Hunter cut him off, saying she had limited time due to a pedicure appointment and claiming Gary Brown and Lee Trutmann were "good guys" and "the best." (*Id.*).According to Gillum, Hunter did not inquire about Brown's behavior, even though she usually followed up on all reports. (Doc. No. 33, Ex. D at 60:2-8, 24-25; 61:1-7, 24-25: 62:1-23). Gillum also alleges that he complained to a store manager, Lee Trutmann, "that Brown was using racist language, including the word "nigger," that it had been going on for years, and that Brown was not scheduling adequate help to work with Gillum." (Gillum Decl. ¶¶13-14). However, Trutmann merely "defended Brown, telling [Gillum] that Brown was one of the best meat market managers and a good guy." (*Id.*).  Accordingly, the Court finds that viewing facts in light most favorable to Gillum, there is a genuine issue of material fact as to whether Safeway knew about the harassment and failed to take reasonable actions to end it.

---

[5] Safeway asserts an affirmative defense with respect to Title VII hostile work environment and retaliation claims. Safeway is correct that such defense is available to it based on the facts of the case. Specifically, in order to avoid direct liability for its supervisors' conduct of harassment, the employer may choose to defend itself by establishing that: 1) "the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and 2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). This defense is available only if the harassing supervisors did not take any tangible employment action against the plaintiff employee. *See id.* Although here Gillum does not assert that the supervisors took any tangible employment action against him, and, therefore, Safeway may assert the affirmative defense, the Court will not decide the question of affirmative defense at this time because there is still a dispute of material fact as to whether the supervisor's conduct can be directly imputed to Safeway.

## IV.    GILLUM HAS ALLEGED A RETALIATION CLAIM

The requirements for establishing a retaliation claim under Title VII and WLAD are essentially the same. Under Title VII and WLAD, to establish a prima facie case for retaliation a plaintiff must show: "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). "Adverse employment action" means "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (citation omitted). To establish the causal link between the adverse action and the protected activity, "plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kelly v. County of Ventura Pers. Dep't*, 28 F.3d 106, *2 (9th Cir. 1994). Causation may be inferred from evidence that "the adverse action occurred shortly after the employee [engaged in a protected activity." *Id.* (citing *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505-06 (9th Cir. 1989); *Burchfield v. Boeing Corp.*, 205 P.3d 145, 152 (Wash. Ct. App. 2005) (citing *Estevez*, 120 P.3d 579, 590 (Wash. Ct. App. 2005)).

### A.    Protected Activity

Safeway argues that Gillum did not engage in protected activity because he did not properly complain about racial harassment by Safeway employees. (Doc.No. 26 at 17). According to Safeway, Gillum  should have filed the grievances through his union but failed to do so. (*Id.* at 22.) The Court disagrees. Gillum provides evidence that he reported allegations of racially discriminatory conduct to supervisors and managers, including Signe Hunter, Lee Trutmann, and Anita Keahey. (Doc. No. 32 at 22; *see also* Gillum Decl. ¶¶7,13-15, 17-19, 21, 23). Gillum alleges that he complained to Anita Keahey several times about Brown's racist comments.  (Gillum Decl. at ¶¶7, 15, 18). He further alleges that when he complained to Hunter

12

about Brown using "racist slurs," she interrupted his complaints saying "David, David, David, you are going to be fine." (Doc. No. 33, Ex. C at 6). Gillum testified at deposition that he continued to complain to Hunter about Brown and other managers' behavior. Gillum also testified that he did not receive any "feedback from [his] reports to [Hunter], and was fearful." (Gillum Decl. ¶23). Gillum further testified that "[he] complained that Hunter could not protect [him]." (*Id.*) In response to his reports, Hunter cut him off, saying she had limited time due to a pedicure appointment and claiming Gary Brown and Lee Trutmann were "good guys" and "the best." (*Id.*). Gillum also alleges that he complained to a store manager, Lee Trutmann, "that Brown was using racist language, including the word "nigger," that it had been going on for years, and that Brown was not scheduling adequate help to work with Gillum." (Gillum Decl. ¶¶13-14). However, Trutmann merely "defended Brown, telling [Gillum] that Brown was one of the best meat market managers and a good guy." (*Id.*). Assuming Gillum's alleged facts to be true (as the Court must for purposes of this motion), Gillum has sufficiently alleged he engaged in protected activity.

**B.    An Adverse Employment Action**

Safeway argues that Gillum cannot demonstrate any adverse action against him because "Gillum is still working in his preferred position as a floating meat cutter." (Def.'s Mot. for Summ. J., Doc. No. 26 at 22). Under Ninth Circuit precedent, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). A hostile work environment may constitute an adverse employment action under both Title VII and WLAD retaliation claims. *Id.* at 1245 (9th Cir. 2000).[6]  Since the Court has already found an issue of

---

[6] Under WLAD, "a hostile work environment, may amount to an adverse employment action." *Harrell v. Washington State ex rel. Dep't Soc. Health Serv.*, 285 P.3d 159, 166 (Wash. Ct. App. 2012) (citing *Kirby v. City of Tacoma*, 98 P.3d 827, 833 (Wash. Ct. App. 2004)).

material fact with respect to the hostile work environment claim, the remaining question is whether the hostile work environment took place in response to Gillum's reports of harassment.

**C.      A Causal Link Between the Protected Activity And the Adverse Action**

Gillum argues that the causal link between the hostile treatment and the protected activity could be inferred by the close proximity in time between his reports and the hostile conduct. *See Kelly*, 28 F.3d at *2 (stating that causation may be inferred from the evidence that "the adverse action occurred shortly after the employee [engaged] in protected activity.") (citing *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505-06 (9th Cir. 1989)); *see also Burchfield v. Boeing Corp.*, 205 P.3d 145, 152 (Wash. Ct. App. 2005). Gillum has provided evidence of the close proximity in time. (*See* Gillum Decl. ¶¶15-16, 21, 23, 27, 29). For example, a few days after Gillum reported to Anita Keahey about the discriminatory treatment, three supervisors (Brown, Trutmann, and Kaiser) called Gillum to a meeting, at which they told him he was not performing adequately and that he had to cut enough meat for two days otherwise he would be fired. (Gillum Decl. ¶¶15-16). During that meeting, Brown called Gillum "boy" and "insubordinate." (*Id.* at ¶16). Although there were prior incidents of hostility by Brown using racial slurs and making racist comments about African American people, this was a direct threat to alter the conditions of employment, i.e. to fire him, that took place right after Gillum complaint about Brown's racist attitude. The fact that the store manager Lee Trutman was present at the meeting and was silent during Brown's comments, made the incident more threatening and serious because a store manager has the authority to make firing decisions. Furthermore, shortly after Gillum made multiple complaints to Hunter and other managers about racial harassment at work, he received phone calls from Brown and Miller calling him "a snitching Nigger," "a dead nigger," and other derogatory statements, which suggests that these comments were made in direct response to Gillum's reports about harassment. ( *Id.* at ¶¶27, 29). In addition, on Gillum's first day under Brown's supervision, Brown warned Gillum not to complain and that "what happened at the

14

store, stayed at the store," and if Gillum complained, Brown would "hunt him down." (Doc. No. 33, Gillum Dep. Ex. B, 113:22-114:11). Gillum further alleges that after these reports "Clint Miller continued to treat [him] in a disrespectful manner, and verbally abused [him], even going so far as to threaten him with a knife. (*Id.* at ¶31). Therefore, viewing the facts in light most favorable to Gillum, Gillum has demonstrated that a genuine issue of material fact exists as to whether the hostile behavior by the supervisors after the alleged reports of harassment took place in response to Gillum's reports of harassment.

## V.    GILLUM HAS NOT ALLEGED A RACIAL DISCRIMINATION CLAIM

To establish a prima facie case of racial discrimination under Title VII a plaintiff must show that: (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, and (4) similarly situated non-African American individuals were treated more favorably. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Washington law has similar requirements. To establish a prima facie case under WLAD, plaintiff must show that: "(1) he belongs to a protected class, (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, nonprotected employee, and (4) he and the nonprotected "comparator" were doing substantially the same work." *Johnson v. Dep't of Soc. & Health Serv.*, 907 P.2d 1223, 1231 (Wash. Ct. App. 1996).

An adverse employment action in the racial discrimination context, unlike in retaliation context, is limited to changes in the "terms and conditions of employment," such as changes in salary, bonus, and overtime pay; changes in hours worked; loss of promotion; and firing. *See Reynaga v. Sun Studs, Inc.*, 27 F. App'x 740, 742 (9th Cir. 2001); *see also Coleman v. California Sch. For the Deaf*, 930 F.2d 26, 2 (9th Cir. 1991) (holding that "[e]xcess scrutiny of [plaintiff's] training request, a letter of counseling, and a memorandum putting [plaintiff] on notice of

15

deficiencies in [plaintiff's] work performance—clearly do not qualify as adverse employment actions.").

Safeway argues that there was no adverse action taken against Gillum with respect to the terms and conditions of his employment: He was not fired and continues to work as a floating meat cutter, a position he admits he prefers. Gillum does not respond to these arguments or offer any evidence to the contrary. Therefore, he fails to show that there is a genuine issue of material fact as to "adverse action" element of prima facie case for racial discrimination. Accordingly, the Court grants Safeway's motion for summary judgment on the racial discrimination claim.

## VI.   GILLUM'S WLAD AND NIED CLAIMS ARE NOT PREEMPTED BY THE LMRA[7]

A state law claim is preempted by the Labor Management Relation Act if the claim arises out of the policies and provisions of Collective Bargaining Agreement (CBA) between an employee and employer. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; *see also Livadas v. Bradshaw*, 512 U.S. 107, 121-22 (1994). The Ninth Circuit follows a two-step analysis when deciding whether § 301 preempts state law. *See Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007). First, the Court considers "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA." *Id.* If the CBA alone gives rise to a claim, then the state law is preempted. *Id.*

If, however, the claim exists independently of CBA provisions, as it does here, the claim is preempted only if the claim relies substantially on the interpretation of CBA agreement. *Id.* To determine whether a state law claim exists independently of the CBA, the Court looks at "the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement

---

[7] Gillum argues that Safeway waived its right to assert a federal preemption under Labor Management Relation Act, 1947, § 301 because Safeway failed to raise it in its answer. However, it is proper to raise a federal preemption defense at summary judgment. *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012) (stating that "[f]ederal preemption is an affirmative defense that a defendant must plead and prove," and further stating that "a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment").

[and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." *Id.* (citing *Livadas*, 512 U.S. at 123).[8] To determine whether the resolution of the claims substantially depends on CBA, the Court must decide whether the analysis of the claim will require the Court to merely "look" at CBA or will require the Court to "interpret" it. *Burnside*, 491 F.3d at 1060. If the Court will have to interpret the terms of CBA, then the claim is preempted; if it needs only to "look" at the terms, the claim is not preempted. *Id.*[9] The burden of proof runs with the defendant. *See Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012).

## A.  WLAD Claims Are Not Preempted

Safeway argues that Gillum's WLAD claims are preempted by § 301 because the resolution of those claims depends on the interpretation of the CBA.

According to Safeway, the provisions in the CBA regarding "hours, schedules, wages, leave, vacation, layoffs, and discharges" need to be interpreted in order to assess Gillum's claims. (Doc. No. 26 at 24). In support of its argument, Safeway cites *Andreasen v. Supervalu, Inc.*, No. 12–cv–05914–RBL, 2013 WL 2149714, at *5 (W.D. Wash. May 16, 2013) in which the district court held the plaintiff's WLAD claims were preempted on the grounds that the CBA set out a specific mechanism through which employees settled discrimination issues and a specific procedure under which the employer should respond to discrimination. *See Andreasen*, 2013 WL 2149714, at *1 (focusing on the CBA's specific terms and procedures). Unfortunately for Safeway, the Court finds that *Andreasen* is materially distinguishable from the case at bar. In *Andreasen*, CBA provided "a three step grievance process ending in binding third-party arbitration," and "the arbitration process [was] the exclusive method of settling grievances under

---

[8] In addition, "reliance on the CBA as an aspect of a defense is not enough to "inject[ ] a federal question into an action that asserts what is plainly a state-law claim." *Burnside*, 491 F.3d at 1060. The Supreme Court explained that "the plaintiff is the master of the complaint" and "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987).

[9] The Supreme Court explained that "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas*, 512 U.S. 124.

the CBA." 2013 WL 2149714, at *1. The CBA in *Andreasen* also provided that any claim by an employee against the employer alleging violation of non-discriminatory policy or any federal or state anti-discrimination law, "shall be subject to the Settlement of Disputes Section" of the CBA. *Id.* In the case at this Court, the CBA does not set out any specific procedures relevant to the present dispute. Safeway points to Article 17, which states that Safeway agrees "not to discriminate on the basis of age, race, color, religion, sex or national origin," and Article 14, which governs the procedure of bringing grievances and that such grievances can be made to address racial discrimination. (Doc. No. 26 at 24). However, Safeway provides no explanation as to how these Articles relate to the resolution of Gillum's state claims, and does not contend that the grievance procedure is mandatory for addressing racial discrimination claims. *See Miller*, 850 F.2d at 547 (explaining that "[t]he mere fact that a CBA contains terms that could govern the same situations that a state law governs does not necessarily mean that the state law requires interpretation of the terms in the CBA.").[10] As explained in *Cramer v. Consol. Freightways, Inc.*, "the need to interpret the CBA must inhere in the nature of the plaintiff's claim. If the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." 255 F.3d 683, 691 (9th Cir. 2001). Safeway fails to demonstrate how an interpretation of the CBA will govern the resolution of Gillum's WLAD claims. Therefore, WLAD claims are not preempted.

### B.  Negligent Infliction of Emotional Distress Claim Is Not Preempted

Safeway argues that Plaintiff's Negligent Infliction of Emotional Distress (NIED) claim is preempted by § 301 because it is "purely duplicative of [Plaintiff's] statutory claims, and so § 301 analysis applies equally to [NIED] claim." (Def.'s Mot. for Summ. J. at 25). Safeway does not point to any authority for its contention. To the contrary, in *Robel v. Roundup Corp.*, 59 P.3d

---

[10] Safeway also refers to the Article 11.07 of the CBA, which imposes a "just cause" requirement on any discipline imposed by Safeway but provides no explanation regarding why this phrase requires interpretation or how it affects the ultimate determination.

611, 619-620 (Wash. 2002), Supreme Court of Washington reviewed plaintiff's WLAD claims as well as tort claims, specifically NIED claim, that arose from the same facts. In *Robel*, plaintiff asserted hostile work environment, retaliation, intentional infliction of emotional distress, and negligent infliction of emotional distress. 59 P.3d at 615-19. All these claims were based on the conduct of harassment by the plaintiff's managers and co-workers due to plaintiff's disability as a result of the work related injury. *Id.* at 614. Plaintiff was allowed to pursue all three claims and prevailed on all three claims regardless of the similarity of legal and factual issues among these claims. *Id.* at 615-621.  Because Safeway did not point to any authority to support its contention, and because Supreme Court of Washington allows plaintiffs to simultaneously pursue claims for NIED and WLAD, the Court finds that Gillum's NIED claim should not be dismissed.  Thus, Safeway's motion for summary judgment regarding the preemption of NIED claim is denied.

## VII.    STATUTE OF LIMITATIONS FOR WLAD AND TITLE VII CLAIMS

Safeway asserts that most of Gillum's claims are time barred.  WLAD has a general three-year statute of limitations. *Antonius v. King County*, 103 P.3d 729, 732 (Wash. 2004). Under 42 U.S.C. § 2000e-5(e)(1), the plaintiff has 300 days from the day the employment discrimination takes place to file Title VII claims.  Since Gillum filed his complaint in November 2013 and his EEOC claim in December 2012, Safeway asserts that all WLAD-related allegations occurring before November 2010 and all Title VII allegations occurring before February 2012 are barred.  The Court disagrees; Gillum's claims are based on a hostile work environment theory and, therefore, are a series of incidents that comprise one claim.

In *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court explained that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" 536 U.S. 101, 115 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). Accordingly, "'[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.'" *Antonius*, 103 P.3d at

734 (citing *Morgan*, 536 U.S. at 117). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* (citing *Morgan*, 536 U.S. at 117).  Therefore, as long as Gillum alleged some incidents contributing to hostile work environment that took place within the three-year limitation period for WLAD claims and 300 days period for Title VII claims, the incidents that took place before the limitation period can also be considered. *See Antonius*, 103 P.3d at 734.

Here, Gillum alleges acts of hostile work environment that took place in January 2011 and April 2012. Specifically, Gillum alleges the phone calls from Brown and Miller, in which they called Gillum "snitching nigger," "dead nigger," "we are going to get you," and "I am going to fuck you up." (Gillum Decl. ¶¶27, 29). In 2011, Phil Sult, a meat wrapper, told Gillum "[w]hy don't you niggers ever take care of your kids." (*Id.* at ¶28). Therefore, because these incidents of hostile behavior contributed to the claim of hostile work environment, "'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Antonius*, 103 P.3d at 734 (citing *Morgan*, 536 U.S. at 117).

The same analysis applies to the retaliation claim. Here, Gillum alleged that Brown, Trutmann, and Kaiser harassed Gillum after he made reports of racial discrimination to Anita Keahey and Hunter in 2010 (Gillum Decl. ¶¶7, 15-16, 21), and some incidents of harassment in retaliation for his complaints took place in 2011 and 2012.[11] Therefore, Gillum's WLAD claims fall within the limitation period of three years. In addition, viewing the facts in the light most favorable to Gillum, the last act of hostile work environment based on race in retaliation for reporting the harassment at work took place in February 2012 when a meat merchandiser called Gillum and another African American "boys." (Doc. No. 29, Ex. B). Therefore, Gillum's Title

---

[11] For example, phone calls in 2011 and 2012 from Brown and Miller calling Gillum "snitching nigger" and "dead nigger." (Gillum Decl. ¶¶27, 29).

VII claims fall within the limitation period of 300 days from the date of the discrimination act to the date Gillum filed a complaint with EEOC, on December 4, 2012.

### VIII.   ORDER

NOW, THEREFORE, THE COURT ORDERS as follows:

1. Safeway's motion for summary judgment with respect to the hostile work environment claim is DENIED;

2. Safeway's motion for summary judgment with respect to the retaliation claim is DENIED; and

3. Safeway's motion for summary judgment with respect to the racial discrimination claim is GRANTED, and the claim is DISMISSED.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE